## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

MARILYNN GOREE                          CIVIL ACTION NO. 09-745

VERSUS                                  JUDGE ELIZABETH ERNY FOOTE

LINCOLN PARISH DETENTION                MAGISTRATE JUDGE HORNSBY
CENTER COMMISSION

## MEMORANDUM RULING

Before this Court is a Motion for Summary Judgment [Record Document 27] filed on behalf of the Defendant, Lincoln Parish Detention Center Commission ("the Commission").  Defendant seeks summary judgment in its favor, and dismissal of Plaintiff's claims with prejudice, on the grounds that many of Plaintiff's claims are barred by her failure to exhaust administrative remedies and/or are untimely, and that there is no evidence Plaintiff's termination was motivated, even in part, by discriminatory animus.  See Record Document 27.  For the reasons stated herein, Defendant's motion for summary judgment is **GRANTED.**

### FACTUAL BACKGROUND

On or about June 29, 1988, Plaintiff Marilynn Goree ("Goree"), an African American female, began employment as a Booking/Correctional Officer for the Lincoln Parish Detention Center ("LPDC") in Lincoln Parish, Louisiana.  For nearly 20 years thereafter, Goree received outstanding performance reviews, ascended through the various ranks, and in April 2004, was promoted to the position of interim

Superintendent/Warden of LPDC.[1]  Prior to her promotion, Goree was earning $16.26 per hour (or approximately $33,800 annually).  Upon becoming interim Superintendent, Goree received a $12,000 raise as well as regular 2.5% annual pay increases throughout her four-year tenure as interim Superintendent.

During the summer of 2007, Lincoln Parish Sheriff Mike Stone ("Sheriff Stone") replaced Randall Hermes, Chief of Police of the City of Ruston ("Chief Hermes"), as chair of the LPDC Commission.  At the time he took over as chair, LPDC was dealing with significant overcrowding issues, the need for capital improvements, and increased costs.  [Goree Depo. pp.56, 73-75; Stone Depo. p.122].  The Commission began considering multiple options to combat the increasing costs and spacing issues, including maintaining the status quo, tax increases, and privatization.  [Record Document 27-7].

In the fall of 2007, LPDC discovered money from the bond funds were missing and entered into a temporary agreement with LaSalle Management ("LaSalle"), a private company which has contracted with various parishes and sheriffs to operate approximately 7-9 prisons in Louisiana.  The Commission contracted with LaSalle to take over the operations of LPDC on a temporary basis for the purpose evaluating the long-term feasibility of operating the LPDC and to investigate the missing funds.

---

[1]From 1983 until his retirement in 2000, Chuck James, a white male, served as the Superintendent of LPDC.  When Mr. James retired, Renwick Payne, an African-American male, was promoted to the position of Superintendent.  Mr. Payne was fired in 2004 after financial improprieties were discovered.  [Hermes Depo., p.45].

LaSalle began its evaluation of LPDC in October 2007.  LaSalle's management team responsible for the LPDC evaluation included Johnny Creed,[2] LaSalle's Chief of Operations, Edward Thompson, and Sue Holliday.  [Creed Depo. pp. 172-75].   Sue Holliday was appointed to serve in the role of Warden during the evaluation period and was responsible for reviewing LPDC's existing policies.  Id.; Creed Declaration ¶ 19.  Mr. Thompson was appointed as the assistant warden and was responsible for reviewing the day-to-day operations of the LPDC.  Id.  During the evaluation process, in addition to investigating the missing funds, LaSalle began painting and landscaping the building, established a twelve-hour shift schedule for corrections officers, replaced the fire alarm system, obtained approval for additional beds, and implemented P.O.S.T. training.  Id. at pp.164-66.  Throughout the evaluation period, Goree continued in her position as interim Superintendent and her job duties and responsibilities remained the same. [Goree Depo. p.92].

In 2008, after considering the various options for addressing the budget and spacing concerns at LPDC, the Commission decided to enter into a permanent contract with LaSalle for operation of the facility.  [Record Document 27-11, Minutes of March 28, 2008 Meeting].  Under this option, inmates could be housed at the LaSalle-owned facility in Jackson Parish, Louisiana with transportation provided by Jackson Parish; LaSalle would be responsible for capital expenses, improvements, and upgrades;

---

[2]Before his employment with LaSalle, Mr. Creed had a twenty-eight (28) year career with the Louisiana Department of Corrections, serving as the chief operations officer for four years.  [Creed Depo. p.16].

current employees could choose to (1) remain Lincoln Parish employees at a lower wage and retain existing benefits or (2) become LaSalle employees at a higher wage without benefits; and all new employees' salaries and benefits would be paid by LaSalle. [Record Document 27-11; Creed Declaration].

The Commission and LaSalle executed a contract on May 30, 2008, the terms of which became effective on June 5, 2008.  Prior to execution of the contract, representatives of both LaSalle and the Commission met with Goree to discuss her future employment.  Based on LaSalle's observations of the facility and Goree's performance as interim Superintendent, LaSalle determined she would not be named as Superintendent/Warden of the facility under LaSalle's management.  Rather, LaSalle intended to introduce a Work Release program at LPDC and offered Goree a position as the program's facilitator.  [Record Document 27-7, p.28; Creed Declaration].  Goree was given the option to (1) remain an employee of Lincoln Parish with an hourly wage of $13.50 and current benefits package, or (2) became an employee of LaSalle with an hourly wage of $15.00 without current medical or retirement benefits.  Under either of these options, Goree's wages would be reduced by more than $20,000.00.  In order to lessen the financial blow, the Commission offered to pay her an additional $10,000 during her first year of employment in the new position.

On May 29, 2008, Goree responded by rejecting both offers, stating: "After careful consideration and exploration of each option, I am sorry that I cannot accept

either one" and requested that her salary remain the same. [Record Document 27-7, p.27]. As a result, Goree's employment at LPDC was terminated.

On October 28, 2008, Goree forwarded a charge questionnaire to the Equal Employment Opportunity Commission ("EEOC") alleging she was discriminated against on the basis of her race, sex, age, and color. See Goree Depo. Exhibit 7 ¶ 4. On February 6, 2009, after completing its investigation, the EEOC issued a "Notice of Right to Sue" letter related to Goree's claims arising under Title VII of the Civil Rights Act of 1964, as amended.

On May 6, 2009, Goree filed this suit against the LPDC Commission[3] alleging, among others, violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., 42 U.S.C. § 1981, the Equal Pay Act, and Louisiana Employment Discrimination Laws, La. R.S. 23:301 et seq. [Record Document 1 ¶ XVIII]. Specifically, Goree alleges she was discriminated against during her tenure as interim Superintendent because the Commission did not accord her the same privileges and authority as her male-predecessors, that Goree's pay was not raised to reflect her increased duties and responsibilities as interim Superintendent, that the Commission hired LaSalle to manage the correctional facility rather than name her permanent Superintendent/Warden, that the Commission removed her from her position as interim Superintendent and informed

---

[3]Goree initially named LaSalle as a defendant [Record Document 1 ¶ V], but later filed a joint motion to dismiss LaSalle on the grounds that all allegations in the Complaint arose out of Goree's employment relationship with LPDC. [Record Document 29]. The Court granted the joint motion and entered partial judgment dismissing with prejudice all claims against LaSalle. [Record Document 31].

her she would have to take a new position with a reduced salary, and that on June 14, 2008—fifteen (15) days before her twentieth (20th) year of employment and qualification for full health benefits as a retiree—the Commission terminated her employment.  Id. at ¶¶ VIII-XVI.  Goree seeks to recover damages, including an award of lost wages and benefits, in addition to attorneys' fees and all costs of these proceedings.  Id. at ¶ XIX.

The Commission seeks summary judgment in its favor and dismissal of Plaintiff's Complaint in its entirety.  The Commission contends 42 U.S.C. § 1981 does not provide a cause of action against LPDC and the LPDC Commission; that Plaintiff's claims concerning her being named "interim" Superintendent, the purported lack of privileges and authority provided her in that position, denial of a raise, and the hiring of LaSalle in 2007 instead of naming her permanent Superintendent are untimely and/or barred by her failure to exhaust administrative remedies; and that there is no evidence Goree's termination was motivated, even in part, by discriminatory animus.  [Record Document 27, pp.10-22].  In opposition, Goree argues the Commission's purported non-discriminatory reasons for terminating her employment are mere pretext and, therefore, that summary judgment in inappropriate in this matter.  [Record Document 33].

## Summary Judgment Standard

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law."

Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L.Ed.2d 265

(1986).  Rule 56(c) "mandates the entry of summary judgment, after adequate time for

discovery and upon motion, against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial."  Id., 477 U.S. at 322, 106 S. Ct. at 2552.  If

the party moving for summary judgment fails to satisfy its initial burden of

demonstrating the absence of a genuine issue of material fact, the motion must be

denied, regardless of the nonmovant's response.  Little v. Liquid Air Corp., 37 F.3d

1069, 1075 (5th Cir. 1994) (en banc).  If the motion is properly made, however, Rule

56(c) requires the nonmovant to go "beyond the pleadings and designate specific facts

in the record showing that there is a genuine issue for trial."  Wallace v. Texas Tech.

Univ., 80 F.3d 1042, 1047 (5th Cir. 1996) (citations omitted).  While the nonmovant's

burden may not be satisfied by conclusory allegations, unsubstantiated assertions,

metaphysical doubt as to the facts, or a scintilla of evidence, Little, 37 F.3d at 1075,

Wallace, 80 F.3d at 1047, all factual controversies must be resolved in favor of the

nonmovant.  Cooper Tire & Rubber Co. v. Farese, 423 F.3d 446, 456 (5th Cir. 2005).

Because employment discrimination claims "involve nebulous questions of

motivation and intent," summary judgment is generally an inappropriate tool for

resolving these cases.  Thornbrough v. Columbus & Greenville R.R. Co., 760 F.2d 633,

640-41 (5th Cir.1985) (citations omitted).  However, if Plaintiff fails to establish a prima

facie case, <u>Bauer v. Albermarle Corp.</u>, 169 F.3d 962, 966 (5th Cir.1999), or if defendant presents strong evidence of a legitimate, nondiscriminatory reason for its actions and the plaintiff is unable to counter with additional evidence of pretext, summary judgment may be properly granted.  <u>Enplanar, Inc. v. Marsh</u>, 11 F.3d 1284, 1295 (5th Cir.1994). With these principles in mind, we now turn to a review of the claims at issue.

## LAW AND ANALYSIS[4]

### A.    Proper Defendants Under § 1981

Section 1 of the Civil Rights Act of 1866, 14 Stat. 27, 42 U.S.C. § 1981, prohibits racial discrimination in the making and enforcement of private employment contracts and provides plaintiffs a cause of action against private employers.  <u>Runyon v. McCrary</u>, 427 U.S. 160, 168, 96 S.Ct. 2586, 2593, 49 L.Ed.2d 415 (1976).  The statute does not, however, provide a cause of action against local government entities.  <u>See</u> <u>Oden v. Oktibbeha County, Miss.</u>, 246 F.3d 458, 462 (5th Cir. 2001).  Rather, the Supreme Court made it clear in <u>Jett v. Dallas Indep. School Dist.</u>, 491 U.S. 701, 731, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) that plaintiffs seeking to assert their substantive rights under § 1981 against state actors must pursue a cause of action under § 1983.

---

[4]Because Louisiana's employment discrimination laws are similar in scope to Title VII, Louisiana courts have looked to federal jurisprudence to interpret Louisiana discrimination laws.  <u>See</u> <u>King v. Phelps Dunbar, L.L.P.</u>, 743 So.2d 181, 187 (La. 1999). Accordingly, the Court will analyze both Plaintiff's federal and state discrimination claims under the Title VII jurisprudence.

The Commission is a local government entity, created by statute and funded by the taxpayers of Lincoln Parish.[5]   See La. R.S. § 848.1 et seq.  Goree cannot maintain an independent action against the Commission under § 1981, and she has not stated a cause of action under § 1983 in this litigation.  See Record Document 1, Exhibit 1. Consequently, Goree's claims arising under § 1981 must be dismissed.

**B.      Exhaustion of Administrative Remedies**

Title VII of the Civil Rights Act of 1964 requires plaintiffs to exhaust their administrative remedies before seeking judicial relief.  McClain v. Lufkin Ind., Inc., 519 F.3d 264, 273 (5th Cir. 2008).  In order to satisfy this requirement, a plaintiff must timely file a charge of discrimination with the EEOC.[6]  "The charge enables the EEOC to investigate and, if appropriate, negotiate a resolution with an employer."  Id.  Only after administrative efforts terminate and the EEOC issues a statutory notice of right to sue may the employee sue the employer in federal court.  Id.

Competing policies underlie judicial interpretation of the exhaustion requirement. Id.  On one hand, the scope of an EEOC charge should be liberally construed "because the provisions of Title VII were not designed for the sophisticated, and because most complaints are initiated pro se."  Pacheco v. Mineta, 448 F.3d 783, 788-89 (5th Cir. 2006).  On the other hand, the "primary purpose of Title VII is to trigger the

---

[5]La.R.S. § 848.1(a) provides: "The Lincoln Parish Detention Center shall be a political corporation, with the power to sue and be sued and shall be governed by a commission to be known as the Lincoln Parish Detention Center Commission."

[6]Because Louisiana is a deferral state, a plaintiff's charge of discrimination must be filed within 300 days of the alleged discriminatory act.  42 U.S.C. § 2000e-5(e)(1).

investigatory and conciliatory procedures of the EEOC, in attempt to achieve non-judicial resolution of employment discrimination claims."  Id.  To reconcile these policies, "this court interprets what is properly embraced in review of a Title VII claim somewhat broadly, not solely by the scope of the administrative charge itself, but by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."  Id. (citing Sanchez v. Standard Brands, Inc., 431 F.2d 455, 463 (5th Cir. 1970)) (internal quotation marks omitted).  In doing so, the Court must engage in a "fact-intensive analysis of the statement given by the plaintiff in the administrative charge, and look slightly beyond its four corners, to its substance rather than its label."  Id.  It is not enough that a discriminatory act alleged in a lawsuit is "based on the same type of discrimination" as that alleged in the charge of discrimination.  See Turner v. St. Luke's Episcopal Health Sys., 2008 WL 706709 at *8 (S.D.Tex. Mar. 14, 2008).  "[T]here must be some factual relationship between the act and the acts described in the charge, beyond the fact that both involve the same employer and the same general type of discrimination."  Id.

Goree's charge of discrimination, received by the EEOC on November 26, 2008,[7] alleges that on April 30, 2008, she was given a letter stating she must accept one of two employment options, both of which included a significant salary reduction, or that her employment at LPDC would be terminated.  [Goree Depo. Exhibit 6 ¶ 5].  Under section 4 of the questionnaire, Goree indicated she believed these actions were taken on the basis of her race, sex, age, and color.  Id. at ¶ 4.  Nowhere does the charge, nor the type-written statement submitted by Goree, include a complaint that she was treated differently from her male predecessor's by having to carry the title of "interim" Superintendent,[8] by not being given the same privileges and authority as her male predecessors,[9] by being denied a pay raise during her tenure as interim Superintendent,

---

[7]In reviewing the record, the Court was unable to find a formal administrative "Charge of Discrimination" that was submitted to the EEOC.  However, the "Intake Questionnaire" which was received by the EEOC on November 26, 2008, includes the following provision: "When this form constitutes the only timely written statement of allegations of employment discrimination, the Commission will, consistent with 29 C.F.R. 1601.12(b) and 29 C.F.R. 1626.8(b), consider it to be a sufficient charge of discrimination under the relevant statute(s)."  [Goree Depo. Exhibit 6].  The Commission implicitly concedes this document, along with the type-written statement submitted by Goree, are sufficient to constitute a "charge of discrimination" as required by Title VII.  See Record Document 27, p. 11 and n.71.

[8]Even if Goree has complained in her EEOC charge of having to carry the title "interim" Superintendent, it is doubtful this would qualify as an "adverse employment action" sufficient to establish a prima facie case of discrimination.  See Pegram v. Honeywell, Inc., 361 F.3d 272, 281 (5th Cir. 2004) ("an adverse employment action consists of 'ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating.'") (internal citation omitted).

[9]Goree claims that, unlike her male predecessors, she was unable to hire an assistant superintendent, program director or training officer to assist her, unable to use the company vehicles, and that she was required to transport inmates and look over paper work every day.  [Goree Depo. pp.130-32].

or that the Commission hired LaSalle in 2007 instead of naming her permanent

Superintendent . See Goree Depo. Exhibits 6 and 7.  Rather, the allegations contained

on both her Intake Questionnaire and her type-written statement concern the actions of

the Commission and LaSalle in 2008 with respect to giving her two employment

options, both at significant salary reductions, and her ultimate termination.  Id.

Having carefully reviewed the language of Goree's Intake Questionnaire and the

additional type-written statement submitted to the EEOC, the Court finds that the

investigation which could reasonably be expected to grow out of the allegations therein

would be limited to the employment actions of the Commission in connection with the

two employment options given to Goree in April 2008 and her ultimate termination from

LPDC on June 14, 2008.   In the absence of any reference to any alleged discriminatory

employment actions by the Commission during Goree's tenure as interim

Superintendent, an investigation of such actions could not reasonably be expected.  See

supra.  Accordingly, the Court finds Goree failed to exhaust her administrative remedies

with respect to her claims concerning being named "interim" Superintendent, the lack of

privileges and authority provided to her in as compared to her male predecessors,

denial of a raise, and the hiring of LaSalle in 2007 instead of naming her permanent

Superintendent.

**C.     Goree's Demotion/Termination Claims**

Title VII prohibits an employer from discriminating against any individual "with

respect to his compensation, terms, conditions, or privileges of employment, because of

such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-

2(a)(1).  The inquiry under Title VII is "whether the defendant intentionally

discriminated against the plaintiff."  Roberson v. Alltel Info. Servs., 373 F.3d 647, 651

(5th Cir. 2004) (internal quotation marks and citations omitted).  Intentional

discrimination can be established either through direct or circumstantial evidence.

Wallace v. Methodist Hosp. Sys., 271 F.3d 212, 219 (5th Cir. 2001).  However, in cases

such as this one, where there is no evidence of direct discrimination, the plaintiff's

claims must be analyzed under the framework set forth in McDonnell Douglas Corp. v.

Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  Under the McDonnell

Douglas framework, in order to survive a motion for summary judgment, the plaintiff

must first create a presumption of intentional discrimination by establishing a prima

facie case of discrimination.  Id., 411 U.S. at 802, 93 S.Ct. at 1824.  In order to

establish a prima facie case of discrimination, the plaintiff must establish (1) that she is

a member of a protected class, (2) that she was qualified for the position at issue, (3)

that she suffered an adverse employment action, and (4) that she was replaced by

someone outside the protected class or was treated less favorably than other similarly

situated employees outside the protected class.  McCoy v. City of Shreveport, 492 F.3d

551, 556 (5th Cir. 2007).

　　　If the plaintiff is able to make a prima facie case, the burden shifts to the

employer to articulate a legitimate, nondiscriminatory reason for its actions.  Berquist v.

Wash. Mut. Bank, 500 F.3d 344, 349 (5th Cir. 2007), cert. denied, 128 S.Ct. 1124, 169

L.Ed.2d 950 (2008).  The employer's burden is "one of production, not persuasion," and "can involve no credibility assessment."  Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 142, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).  If the employer sustains its burden, the plaintiff's prima facie case is dissolved, and the burden shifts back to the plaintiff to establish either that the employer's proffered reasons are merely pretextual and "unworthy of credence."[10]  Reeves, 530 U.S. at 143, 120 S.Ct. at 2106 (quoting Tex. Dept. of Comty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).  Once a Title VII claim reaches the pretext stage, the only question remaining for summary judgment purposes is "whether there is a conflict in substantial evidence to create a jury question regarding discrimination."  Haynes v. Pennzoil Co., 207 F.3d 296, 300 (5th Cir. 2000).

### 1.   Prima Facie **Case**

In its motion for summary judgment, the Commission admits Goree can establish the first three elements of her prima facie case, but argues she cannot establish a genuine issue of material fact as to the fourth element of the prima facie case.  See Record Document 27, p.17.  Specifically, the Commission argues Goree cannot show that she was replaced by someone outside the protected class because she was

---

[10]Although the presumption of discrimination is dissolved once the employer meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case "and inferences properly drawn therefrom. . . on the issue of whether the defendant's explanation is pretextual."  Reeves, 350 U.S. at 143, 120 S.Ct. at 2106 (quoting Burdine, 450 U.S. at 255, n.10, 101 S.Ct. 1089)).

replaced by a company, not an individual.  See Id. at p.18.  Moreover, the individual team members employed by LaSalle who purportedly took over the duties and responsibilities of the Superintendent—Sue Holliday and Ed Thompson—were both members of a protected class.[11]  The Commission also argues there is no evidence that a similarly situated employee was treated more favorably, as there was no other person in the position of Superintendent to compare her treatment.  [Record Document 27, pp.17-18].

In response, Goree claims Sue Holliday never actually performed the duties of a superintendent and that her placement as Superintendent "was merely a sham." [Record Document 33, p.17].  Goree alleges she was eventually replaced in earnest by Ed Thompson, who was replaced by John Smith, who was subsequently replaced by Billy Tigner—all of whom are men.  Id. at p.18.

Although Goree's Complaint does not specify the protected characteristic Goree claims was unlawfully used by the Commission in making adverse decisions about her employment, it can be assumed, based on the allegations in her Intake Questionnaire and type-written statement, that Goree is alleging she was discriminated against on the basis of her race (African-American) and sex (female).[12]  See Goree Depo. Exhibits 6

---

[11]Sue Holliday, a female, was appointed as Superintendent/Warden during the evaluation period from October 1, 2007 through May 30, 2008.  [Creed Declaration ¶ 19].  Ed Thompson, an African-American male, was appointed as Superintendent/Warden on May 31, 2008 after the parties executed the contract for LaSalle to permanently manage the LPDC.  Id. at ¶¶ 4, 9-10.

[12]During her deposition, Goree remained unable to articulate the specific protected characteristic(s) unlawfully used by the Commission.

and 7.  Thus, even if the Court were to accept Goree's allegations that the placement of

Sue Holliday as Superintendent "was merely a sham," Goree's argument ignores the

fact that Ed Thompson is African-American and a member of a protected class (i.e.

African American).  Furthermore, Goree has offered no evidence to demonstrate that

persons similarly situated were treated more favorably.[13]  Nevertheless, in an

abundance of caution, the Court will assume arguendo that Goree can establish a prima

facie case of discrimination and proceed to the next step of the <u>McDonnell Douglas</u>

analysis.

---

| | |
|---|---|
| Q. | Why do you believe that decision was because of your race, age, and/or gender? |
| A. | I don't know. |
| Q. | Do you believe that the Lincoln Parish Detention Center Commission hired LaSalle Management to run the detention center, that that act had anything to do with your race, age, or gender? |
| A. | Yes. |
| Q. | Why do you believe that? |

\* \* \*

| | |
|---|---|
| A. | . . . It wasn't because I wasn't qualified.  I had the qualifications.  I had the education.  I had the experience.  I had twenty years experience.  And according to the process of elimination, that was what was left. |

[Goree Depo. pp.154-55].

[13]Goree argues she was treated differently than her male predecessors during her tenure as interim Superintendent.  However, as the Court has already determined, Goree failed to exhaust her administrative remedies with respect to this claim and her argument is irrelevant for purposes of determining whether Goree's demotion and/or termination were motivated by a discriminatory animus.  <u>See</u> <u>infra</u>.

### 2.      Legitimate, Non-Discriminatory Reason

In seeking summary judgment in its favor, the Commission contends the decision to offer Goree a reduced role at LPDC at a reduced salary and her termination "not only had nothing to do with her race or gender" or "her qualifications and experience," but that "it had nothing to do with her at all."  [Record Document 27, pp.1-2].  According to the Commission, it "simply concluded that contracting out the management of the facility to LaSalle was the best option for fulfilling their responsibility to keep prisoners off the streets of Lincoln Parish."  Id. at p.2.  During his deposition, Sheriff Stone explained that when LaSalle took over management of LPDC, the overcrowding issues were solved because LaSalle was able to transport and house inmates at other LaSalle-managed facilities, the budget issues were solved, and they offered organization, management, and professionalism from Johnny Creed, an expert in the field of corrections.  [Stone Depo. pp.169-72].  This option, nor any of the other options considered by the Commission, considered Goree's future as interim Superintendent. [Stone Declaration ¶ 12].

As LaSalle was preparing to take over management of LPDC, LaSalle advised the Commission that Goree did not have the strengths required to succeed as Superintendent and that it would be selecting Ed Thompson to fill the position, as he "had exhibited the operational knowledge and experience in the areas of security operations" that a warden should possess.  [Creed Declaration ¶¶ 14-15].  The Commission acquiesced in this decision as, under the contract, LaSalle would be in

charge of LPDC and entitled to select the individual it would employ in its top management position at the facility.  [Stone Declaration ¶ 13].  However, the Commission requested that LaSalle identify another position for Goree so that she could maintain her employment at LPDC.  Id. at ¶ 14.  LaSalle then created an administrative position responsible for prisoner work releases and stays, and offered the position to Goree.  [Stone Declaration ¶ 14; Creed Declaration ¶¶ 16-17].  The position was offered to Goree with the option to (1) continue as an employee of Lincoln Parish changing to an administrator with an hourly wage of $13.20 and current benefits package, or (2) become an employee of LaSalle with an hourly wage of $15.00 without the current medical or retirement benefits.[14]  [Goree Depo. Exhibit 9].  Because Goree's salary would be significantly reduced under either option, the Commission also offered to pay her an additional $10,000 during her first year in the new position to alleviate any hardship caused by the salary reduction.  [Stone Declaration ¶ 14; Goree Depo. Exhibit 9].  Goree refused to accept either option and requested her salary remain the same. [Record Document 27-7, p.31].

On June 3, 2008, all LPDC employees were informed that the Commission had signed a "Cooperative Endeavor Agreement" with LaSalle to operate, manage, and maintain the LPDC, and that the agreement would become effective on June 5, 2008.

---

[14]Indeed, all LPDC employees were given the option to remain Lincoln Parish employees at a lower wage and retain existing benefits or become LaSalle employees at a higher wage without benefits.  [Creed Declaration; Record Document 27-11].

[Record Document 27-7, pp.31-35].  In addition, the following notice was provided to all employees:

> Several weeks ago each employee was given the option to remain an employee of the Lincoln Parish Detention Center or to become an employee of LaSalle Management Company. Those employees who have not accepted one of the options given to them by June 14, 2008 will be considered terminated and neither an employee of the Lincoln Parish Detention Center nor LaSalle Management Company.

Id.

According to the Commission, Goree's request to remain in her position as interim Superintendent with no reduction in salary was denied, and her employment terminated, "because it had contracted with LaSalle to manage the facility and it was within LaSalle's duties under its obligations to manage to select the Superintendent." [Stone Declaration ¶ 17].

### C.   Pretext

Because the Commission was able to proffer a legitimate, nondiscriminatory reason for the challenged employment actions, the burden shifts to Goree to produce substantial evidence that the reason articulated by the Commission is mere pretext for discrimination.   Laxton v. Gap Inc., 333 F.3d 572, 578 (5th Cir. 2003).  Pretext may be established either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence.  See Id.; Reeves, supra, 530 U.S. at 147-48, 120 S.Ct. at 2109.  Mere conclusory assertions are insufficient to support an inference of pretext and defeat a motion for summary

judgment.  See Wallace v. Methodist Hosp. Sys., 271 F.3d 212, 220 (5th Cir. 2001);

Shackelford v. Deloitte & Touche, LLP, 190 F.3d 398, 408-09 (5th Cir. 1999).

Goree disputes the Commission's proffered explanation for her termination and

contends its stated reasons are merely pretext.  [Record Document 33].  Specifically,

Goree claims the record demonstrates that Sheriff Stone is related to the wife of a

principal owner of LaSalle,[15] that Sheriff Stone made no real effort to explore other

available options, and, regardless of its relationship with LaSalle, that the Commission

was wholly and exclusively responsible for appointing, employing, and terminating the

superintendent of the detention center.[16]  Id. at p.23.  However, upon reviewing the

record, it appears Goree's assertions are exaggerated, unsubstantiated by the evidence,

and/or wholly irrelevant to a determination of pretext.  Goree's assertions fail to

recognize the challenged employment decisions were made by all five members of the

Commission, not solely by Sheriff Stone.  There is simply no evidence in the record from

---

[15]Sheriff Stone testified at his deposition that Clay McConnell's wife is a "distant cousin" of his.  [Stone Depo. p.115].

[16]Goree also asserts that the offer of the additional $10,000 payment was contingent on her agreement to refrain from taking legal action against anyone involved in this matter.  Goree's assertion is inaccurate, as the offer reflects that she would receive the $10,000 regardless of which employment option she chose and that, if she rejected the employment offers, the $10,000 would still be available upon her signing a release of all claims.  [McDonnell Affidavit, Exhibit 1].  Moreover, as an evidence of compromise, this offer is inadmissible to establish liability.  See Fed. R. Evid. 408(a).

which the Court could conclude that the "Cooperative Endeavor Agreement" executed by the Commission and LaSalle was anything more than an arms-length transaction.[17]

In a further effort to establish pretext, Goree argues that the Commission's alleged financial and overcrowding concerns were not real problems and cannot serve as a basis for her termination.  Id. at p.22.  Goree's argument is in direct contrast to her deposition testimony, where she admitted LPDC "had an overcrowding problem" and that they were forced to "ROR inmates", i.e. release inmates on their own recognizance, to try to alleviate the problem.  [Goree Depo. pp.72, 74].  Goree also admitted that the Commissioners had discussed the LPDC's budget and were concerned about its long-term financial viability.  Id. at p.82.  Moreover, the main thrust of Goree's argument does not dispute the existence of the facility's financial and spacing problems but argues the problems should have been addressed in a different manner.  This argument is likewise unsubstantiated by the evidence and is irrelevant to establishing pretext for discrimination.  The Fifth Circuit has "repeatedly and emphatically stated that anti-discrimination laws 'are not vehicles for judicial second-guessing of business decisions.'"

---

[17]Even if Goree's allegations were substantiated, these facts are merely suggestive of nepotism and are not pretext for race or gender discrimination.  Reeves, supra, 530 U.S. at 148, 120 S.Ct. at 2109 ("there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory."); see also, Henderson v. Int'l Union, 263 F.Supp.2d 1245, 1285-86 (D.Kan. 2003) (recognizing that nepotism cannot be equated to discrimination and is not actionable under the federal antidiscrimination laws); Clement v. Madigan, 820 F.Supp. 1039, 1046 (W.D.Mich. 1992) (recognizing that "[f]ederal law does not impose restrictions against nepotism.").

Mato v. Baldauf, 267 F.3d 444, 452 (5th Cir. 2001)[18] (quoting Deines v. Tex. Dept. of Protective & Regulatory Serv., 164 F.3d 277, 281 (5th Cir. 1999)).

Here, the uncontroverted evidence demonstrates LPDC was suffering from significant overcrowding issues, facing a budget deficit, and in need of capital improvements to the facility.  Each of these issues were resolved by hiring LaSalle to take over the management and operations of the facility.  The fact that other options were available does not make the Commission's stated reason for entering into the contract "false or unworthy of credence" and a pretext for discrimination.[19]

### CONCLUSION

Having carefully considered the memoranda and evidence submitted by the parties in support of and in opposition to the Commission's motion for summary judgment, the Court concludes that the LPDC Commission is entitled to judgment in its favor as a matter of law because Goree has failed to provide substantial evidence of pretext.  Accordingly, finding no genuine issues of material fact remain, the Commission's motion for summary judgment shall be **GRANTED**, and Goree's claims shall be **DISMISSED WITH PREJUDICE.**

A Judgment consistent with this Memorandum Ruling shall issue herewith.

---

[18]In Mato, the Fifth Circuit rejected plaintiff's argument that the employer's decision to formulate a reorganization plan to improve its operations and cut its budget, finding that plaintiff and her witnesses had done nothing more than register their disagreement with the employer's business plans.

[19]"Whether the employer's decision was the correct one, or the fair one, or the best one is not a question within the jury's province to decide."  Deines, 164 F.3d at 281.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, on this 22nd day of October, 2010.

ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE